Filed 11/24/25  P. v. Flores CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>EDUARDO FLORES,<br><br>Defendant and Appellant. | F086893<br><br>(Super. Ct. No. SF017860A)<br><br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING**<br><br>[NO CHANGE IN JUDGMENT] |

**THE COURT:**

It is ordered that the opinion filed herein on October 27, 2025, be modified in the following particulars:

1.  On page 10, the first full paragraph commencing "At oral argument" is deleted and the following paragraphs are inserted in its place:

> In appellate briefs and at oral argument, defendant's appellate counsel focused on the premeditation finding and argued section 1385, subdivision (c)(2)(A)'s discriminatory sentencing circumstance and the Racial Justice Act.  In spite of the fact that section 1385, subdivision (c) does not apply to the premeditation finding, counsel asked us to (1) construe the request to dismiss the allegation as a substantive Racial Justice Act claim based on racial disparity and bias in charging and sentencing and dismiss it; or (2) remand the case to the trial court to hold an evidentiary hearing; or (3) stay the appeal and remand the case to the trial court to allow defendant to make the Racial Justice Act motion and request

additional discovery to support his claim.  Counsel insisted we "should construe [defendant]'s [section 1385, subdivision (c)] request as a [Racial Justice Act] motion and remand for [an evidentiary] hearing, because [defendant] met his *prima facie* burden to require the trial court to hold an evidentiary hearing under the [Racial Justice Act]."  The record demonstrates no substantive Racial Justice Act motion was ever made below; therefore, any claims pertaining to such a motion are forfeited.  (*People v. Singh* (2024) 103 Cal.App.5th 76, 112–115; *People v. Lashon* (2024) 98 Cal.App.5th 804, 815–816; see *JRS Products, Inc. v. Matsushita Electric Corp. of America* (2004) 115 Cal.App.4th 168, 178 ["Appellate courts are loath to reverse a judgment on grounds that the opposing party did not have an opportunity to argue and the trial court did not have an opportunity to consider."].)  Moreover, counsel does not provide any credible authority that would permit an appellate court to alchemize an unsuccessful request for dismissal under section 1385, subdivision (c) into a substantive Racial Justice Act motion.  We will not ignore the fact that section 1385, subdivision (c), does not apply to the premeditation finding.  We decline counsel's requests.

Also, for the first time at oral argument, defendant's appellate counsel asserted the premeditation finding should be dismissed pursuant to Assembly Bill No. 1071 (2025–2026 Reg. Sess.) and Senate Bill No. 734 (2025–2026 Reg. Sess.), which were enacted October 13, 2025 (three days before oral argument) and made amendments to the Racial Justice Act that take effect January 1, 2026.  (See Stats. 2025, ch. 784, § 2.5; *id.*, ch. 721, § 2.)  This contention similarly asks us to ignore the fact that no motion under the Racial Justice Act was raised at the trial level and assumes such a motion may be extracted from defendant's failed section 1385, subdivision (c) request for dismissal, propositions we have already rejected.  Furthermore, " '[a]n appellate court is not required to consider any point made for the first time at oral argument, and it will be deemed waived.' [Citations.]" (*People v. Pena* (2004) 32 Cal.4th 389, 403; see *Ramirez v. Department of Motor Vehicles* (2023) 88 Cal.App.5th 1313, 1335 ["[A]n appellate court is under no mandatory duty to consider 'forfeited arguments that raise pure questions of law.' "].)  Forfeiture is especially appropriate here because the Attorney General had slim—if any—notice of an argument based on newly enacted legislation and did not have a reasonable opportunity to respond thereto.  (Cf. *People v. Tully* (2012) 54 Cal.4th 952, 1075 ["It is axiomatic that arguments made

for the first time in a reply brief will not be entertained because of the unfairness to the other party."]; see *JRS Products, Inc. v. Matsushita Electric Corp. of America*, *supra*, 115 Cal.App.4th at p. 178.)

2. In the now inserted first full paragraph on page 10, after the sentence ending "the trial court did not have an opportunity to consider."].),'" add as footnote 8 the following footnote, which will require renumbering of all subsequent footnotes:

> [8] In the alternative, defendant's appellate counsel claimed defendant received ineffective assistance of counsel because his trial attorney failed to make a Racial Justice Act motion below. (See generally *Strickland v. Washington* (1984) 466 U.S. 668.)
>
> "[C]ertain practical constraints make it more difficult to address ineffective assistance claims on direct appeal rather than in the context of a habeas corpus proceeding." (*People v. Mickel* (2016) 2 Cal.5th 181, 198.) "The record on appeal may not explain why counsel chose to act as he or she did. Under those circumstances, a reviewing court has no basis on which to determine whether counsel had a legitimate reason for making a particular decision, or whether counsel's actions or failure to take certain actions were objectively unreasonable." (*Ibid.*) "Moreover, we begin with the presumption that counsel's actions fall within the broad range of reasonableness, and afford 'great deference to counsel's tactical decisions.' [Citation.] Accordingly, [the California Supreme Court] ha[s] characterized defendant's burden as 'difficult to carry on direct appeal,' as a reviewing court will reverse a conviction based on ineffective assistance of counsel on direct appeal only if there is affirmative evidence that counsel had ' " 'no rational tactical purpose' " ' for an action or omission. [Citation.]" (*Ibid.*)
>
> The record before us does not reveal why defendant's trial attorney did not make a Racial Justice Act motion. Absent any affirmative evidence that there was no rational tactical purpose for counsel's forbearance, "it would be inappropriate for us to address defendant's ineffectiveness claim on direct appeal." (*People v. Mickel*, *supra*, 2 Cal.5th at p. 200.)

There is no change in the judgment.  Defendant's petition for rehearing is denied.

DETJEN, J.

WE CONCUR:


LEVY, Acting P. J.


FRANSON, J.

4.

Filed 10/27/25  P. v. Flores CA5 (unmodified opinion)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>EDUARDO FLORES,<br><br>Defendant and Appellant. | F086893<br><br>(Super. Ct. No. SF017860A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Charles R. Brehmer, Judge.

Denise M. Rudasill, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Eric L. Christoffersen and John Merritt, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

On June 25, 2014, defendant Eduardo Flores—then 33 years old—fired multiple gunshots at the victim's residence. In subsequent statements to law enforcement, defendant revealed he intended to kill the victim because the victim "slept with his ex-girlfriend" and " 'mess[ed]' with [his] 'kid.' " (*People v. Flores* (May 21, 2018, F071678) [nonpub. opn.].)

Defendant was charged with attempted murder (Pen. Code,[1] §§ 187, subd. (a), 664 [count 1]), assault with a firearm (§ 245, subd. (a)(2) [count 2]), shooting at an inhabited dwelling (§ 246 [counts 3 & 4]), discharging a firearm in a grossly negligent manner (§ 246.3, subd. (a) [count 5]), misdemeanor receipt of stolen property (§ 496, subd. (a) [count 8]), and possession of a firearm by a convicted felon (§ 29800, subd. (a)(1) [count 9]).[2] The information further alleged: (1) in connection with count 1, the attempted murder was willful, deliberate, and premeditated (§§ 189, 664, subd. (a)) and defendant personally used a firearm (§ 12022.5, subd. (a)); (2) in connection with all counts, defendant was previously convicted of kidnapping, which qualifies as a strike under the "Three Strikes" law (§§ 667, subds. (c)–(j), 1170.12, subds. (a)–(e)); and (3) in connection with counts 1 through 5, defendant was previously convicted of a serious felony (§ 667, subd. (a)).

Following trial, the jury found defendant guilty as charged and found true the premeditation and personal firearm use allegations. In a bifurcated proceeding, the trial court found true the strike and prior serious felony allegations. At a May 15, 2015 sentencing hearing, the trial court imposed life with the possibility of parole with a

---

[1] Unless otherwise indicated, subsequent statutory citations refer to the Penal Code.

[2] Defendant was also charged with two counts of felony child endangerment (§ 273a, subd. (a) [counts 6 & 7]). Subsequently, per the prosecution's request, the trial court dismissed these counts.

minimum eligibility date of 14 years plus five years for the prior serious felony enhancement and 10 years for the personal firearm use enhancement on count 1; a consecutive 14 years (the upper term doubled) plus five years for the prior serious felony enhancement on count 3; a consecutive three years four months (one-third the middle term doubled) on count 4; and a consecutive one year, four months (one-third the middle term doubled) on count 9. Punishment was imposed on counts 2, 5, and 8, but execution thereof was stayed pursuant to section 654.

Multiple appeals ensued. On the first appeal, this court reversed defendant's conviction on count 5, vacated the sentence, and remanded the matter for resentencing. (*People v. Flores*, *supra*, F071678.) At a September 25, 2018 resentencing hearing, the trial court imposed life with the possibility of parole with a minimum eligibility date of 14 years plus five years for the prior serious felony enhancement and 10 years for the personal firearm use enhancement on count 1; a consecutive 14 years (the upper term doubled) plus five years for the prior serious felony enhancement on count 4; and a consecutive one year, four months (one-third the middle term doubled) on count 9. Punishment was imposed on counts 2, 3, and 8, but execution thereof was stayed pursuant to section 654.

On the second appeal, this court conditionally reversed the judgment and remanded the matter for consideration of any motion for mental health diversion made by defendant pursuant to section 1001.36 or—in the event such a motion is denied— resentencing. (*People v. Flores* (Apr. 8, 2022, F078226) [nonpub. opn.].) At a February 22, 2023 hearing, the trial court denied defendant's section 1001.36 motion. At a September 21, 2023 hearing, the trial court denied defendant's renewed section 1001.36 motion and struck the prior serious felony and personal firearm use enhancements with respect to count 1. It imposed life with the possibility of parole with a minimum eligibility date of 14 years on count 1; a concurrent 14 years (the upper term doubled) plus five years for the prior serious felony enhancement on count 4; and a concurrent six

3.

years (the upper term doubled) on count 9.  Again, punishment was imposed on counts 2, 3, and 8, but execution thereof was stayed pursuant to section 654.

Now, on this third appeal, defendant argues the trial court was required to dismiss the prior strike and premeditation findings under section 1385, subdivision (c) because more than one enhancement was alleged in the case (§ 1385, subd. (c)(2)(B)) and application of these findings would result in a sentence exceeding 20 years (*id.*, subd. (c)(2)(C)).  Alternatively, he argues the court abused its discretion when it refused to dismiss the findings in light of the aforementioned mitigating circumstances as well as three additional ones:  (1) application of the findings "would result in a discriminatory racial impact as described in paragraph (4) of subdivision (a) of Section 745" (§ 1385, subd. (c)(2)(A)); (2) "[t]he current offense is connected to mental illness" (*id.*, subd. (c)(2)(D)); and (3) "[t]he current offense is connected to prior victimization or childhood trauma" (*id.*, subd. (c)(2)(E)).  Defendant also claims his motion for mental health diversion was erroneously denied.  For the reasons set forth below, we reject these contentions and affirm the judgment.

## DISCUSSION

I.    **Section 1385, subdivision (c) does not apply in the instant case because neither a strike nor premeditation finding constitutes an "enhancement."**

a.  *Legal overview*

"Prior to January 1, 2022, section 1385 provided trial courts with discretion to dismiss sentencing enhancements in the interest of justice.  The statute did not provide direction as to how courts should exercise that discretion.  In October 2021 the Legislature passed and the Governor signed Senate Bill No. 81 (2021–2022 Reg. Sess.) . . . , which, effective January 1, 2022, amended section 1385 to provide guidance regarding the exercise of discretion in dismissing sentencing enhancements."  (*People v. Anderson* (2023) 88 Cal.App.5th 233, 238.)

Senate Bill No. 81 (2021–2022 Reg. Sess.) added subdivision (c) to section 1385. (Stats. 2021, ch. 721, § 1.) This provision currently reads in part:

"(1) Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute.

"(2) In exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances in subparagraphs (A) to (I) are present. Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety. 'Endanger public safety' means there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others.

"(A) Application of the enhancement would result in a discriminatory racial impact as described in paragraph (4) of subdivision (a) of Section 745.

"(B) Multiple enhancements are alleged in a single case. In this instance, all enhancements beyond a single enhancement shall be dismissed.

"(C) The application of an enhancement could result in a sentence of over 20 years. In this instance, the enhancement shall be dismissed.

"(D) The current offense is connected to mental illness.

"(E) The current offense is connected to prior victimization or childhood trauma. [¶] . . . [¶]

"(4) The circumstances listed in paragraph (2) are not exclusive and the court maintains authority to dismiss or strike an enhancement in accordance with subdivision (a).[3]"

---

[3] "The judge or magistrate may, either on motion of the court or upon the application of the prosecuting attorney, and in furtherance of justice, order an action to be dismissed. . . ." (§ 1385, subd. (a).)

5.

Section 745, which was added by the California Racial Justice Act of 2020 (Racial Justice Act) (see Stats. 2020, ch. 317, § 1 et seq.), reads in pertinent part:

"(a) The state shall not seek or obtain a criminal conviction or seek, obtain, or impose a sentence on the basis of race, ethnicity, or national origin. A violation is established if the defendant proves, by a preponderance of the evidence, any of the following: [¶] . . . [¶]

"(4)(A) A longer or more severe sentence was imposed on the defendant than was imposed on other similarly situated individuals convicted of the same offense, and longer or more severe sentences were more frequently imposed for that offense on people that share the defendant's race, ethnicity, or national origin than on defendants of other races, ethnicities, or national origins in the county where the sentence was imposed.

"(B) A longer or more severe sentence was imposed on the defendant than was imposed on other similarly situated individuals convicted of the same offense, and longer or more severe sentences were more frequently imposed for the same offense on defendants in cases with victims of one race, ethnicity, or national origin than in cases with victims of other races, ethnicities, or national origins, in the county where the sentence was imposed."[4]

b. *Analysis*

Defendant offers two explanations for why the strike and premeditation findings should have been dismissed. First, "multiple enhancements were alleged in [his] case" (see § 1385, subd. (c)(2)(B)) and the application of the "premeditation/deliberation enhancement" and "prior strike doubling enhancement" "could result in [him] receiving a

---

[4] Below, in a sentencing motion filed May 19, 2023, defense counsel contended section 1385, subdivision (c)(2)(A)'s mitigating circumstance applied because the prosecution "engaged in racial bias when *charging* [defendant] in 2014." (Italics added.) However, section 1385, subdivision (c)(2)(A) is explicitly limited to bias in *sentencing* as set forth in section 745, subdivision (a)(4). (Cf. § 745, subd. (a)(3) ["The defendant was charged or convicted of a more serious offense than defendants of other races, ethnicities, or national origins who have engaged in similar conduct and are similarly situated, and the evidence establishes that the prosecution more frequently sought or obtained convictions for more serious offenses against people who share the defendant's race, ethnicity, or national origin in the county where the convictions were sought or obtained."].)

sentence of over 20 years" (see *id.*, subd. (c)(2)(C)). In either circumstance, dismissal is mandatory.[5] Second, even if not statutorily mandated, dismissal was warranted in the instant case because multiple mitigating factors were present—i.e., the multiple enhancement circumstance (§ 1385, subd. (c)(2)(B), the "over 20 years" circumstance (*id.*, subd. (c)(2)(C)), the discriminatory sentencing circumstance (*id.*, subd. (c)(2)(A)), the mental illness circumstance (*id.*, subd. (c)(2)(D)), and the childhood trauma circumstance (*id.*, subd. (c)(2)(E))—and dismissal would not endanger public safety. Defendant's reasoning assumes strike and premeditation findings are enhancements for the purpose of section 1385, subdivision (c). This premise is fallacious.

"The proper interpretation of a statute is a question of law we review de novo." (*People v. Lewis* (2021) 11 Cal.5th 952, 961.) "The court's role in construing a statute is to 'ascertain the intent of the Legislature so as to effectuate the purpose of the law.' [Citations.] In determining the Legislature's intent, a court looks first to the words of the statute. [Citation.] '[I]t is the language of the statute itself that has successfully braved the legislative gauntlet.' [Citation.]" (*People v. Snook* (1997) 16 Cal.4th 1210, 1215.) "When we interpret statutes, we usually begin by considering the ordinary and usual meaning of the law's terms, viewing them in their context within the statute." (*In re Friend* (2021) 11 Cal.5th 720, 730.) "When, however, a term has developed a particular meaning in the law, we generally presume the legislative body used the term in that sense rather than relying on ordinary usage." (*Ibid.*; see § 7, subd. (c) ["Words and phrases . . . as may have acquired a peculiar and appropriate meaning in law . . . shall be construed according to that peculiar and appropriate meaning."].)

"Subdivision (c) of section 1385 expressly applies to the dismissal of an 'enhancement.' " (*People v. Burke* (2023) 89 Cal.App.5th 237, 243 (*Burke*), citing

_____

[5] Defendant emphasizes subdivision (c)(2)(B) and (C) of section 1385 contain the phrase "shall be dismissed."

§ 1385, subd. (c)(1); accord, *People v. Serrano* (2024) 100 Cal.App.5th 1324, 1337 (*Serrano*).) "The term 'enhancement' has a well-established technical meaning in California law. [Citation.] 'A sentence enhancement is "an additional term of imprisonment added to the base term." ' [Citations.]" (*Burke*, *supra*, at p. 243; accord, *Serrano*, *supra*, at p. 1337; see *People v. McDowell* (2024) 99 Cal.App.5th 1147, 1155 ["California courts have used the same definition of enhancement—an additional punishment added to the base term—for decades."].) We "presume the Legislature was aware of, and acquiesced in, . . . this established judicial definition of enhancement" (*Burke*, at p. 243) and "will not conclude that the Legislature intended to give the word 'enhancement' a different and much broader meaning without any express indication in the text of the statute" (*McDowell*, *supra*, at p. 1155). (See *Burke*, at p. 243 ["The Legislature did not otherwise define the word 'enhancement' in section 1385."].)

" 'Unlike an enhancement, which provides for an additional term of imprisonment, [a penalty provision] sets forth an alternate penalty for the underlying felony itself, when the jury has determined that the defendant has satisfied the conditions specified in the statute.' [Citation.]" (*People v. Jones* (2009) 47 Cal.4th 566, 578, italics omitted.)

"Under the Three Strikes law, if a defendant is convicted of a felony, and the trial court or jury finds one or more prior strikes . . . , sentencing proceeds under the Three Strikes law '[n]otwithstanding any other law.' " (*People v. Jefferson* (1999) 21 Cal.4th 86, 92, quoting § 667, subd. (c).) "The law contains two separate sentencing schemes: one for defendants with one prior strike . . . and the other for defendants with two or more prior strikes." (*People v. Jefferson*, *supra*, at p. 92.) "If a defendant has one prior serious or violent felony conviction . . . that has been pled and proved, the determinate term or minimum term for an indeterminate term shall be twice the term otherwise provided as punishment for the current felony conviction." (§ 667, subd. (e)(1); accord, § 1170.12, subd. (c)(1).) The Three Strikes law "articulates an alternative sentencing scheme for the current offense rather than an enhancement." (*People v. Superior Court* (*Romero*) (1996)

13 Cal.4th 497, 527; accord, *Burke*, *supra*, 89 Cal.App.5th at p. 243.) "It is not an enhancement because it does not add an additional term of imprisonment to the base term." (*People v. Williams* (2014) 227 Cal.App.4th 733, 744; see *People v. Sok* (2010) 181 Cal.App.4th 88, 93 ["[E]nhancements are added after the determination of the base term and are not doubled."].) Given "[t]he plain language of subdivision (c) of section 1385 applies only to an 'enhancement,' and the Three Strikes law is not an enhancement" (*Burke*, *supra*, at p. 244), the statute does not apply to strike findings. "If the Legislature had wanted section 1385, subdivision (c) to apply to prior strikes as well as to enhancements as legally defined, it would have said so." (*People v. Olay* (2023) 98 Cal.App.5th 60, 67.)

Section 664, subdivision (a) provides in part:

"If the crime attempted is punishable by imprisonment in the state prison, or by imprisonment pursuant to subdivision (h) of Section 1170, the person guilty of the attempt shall be punished by imprisonment in the state prison or in a county jail, respectively, for one-half the term of imprisonment prescribed upon a conviction of the offense attempted. *However, if the crime attempted is willful, deliberate, and premeditated murder, as defined in Section 189, the person guilty of that attempt shall be punished by imprisonment in the state prison for life with the possibility of parole.* If the crime attempted is any other one in which the maximum sentence is life imprisonment or death, the person guilty of the attempt shall be punished by imprisonment in the state prison for five, seven, or nine years. . . ." (Italics added.)

"[T]he provision of section 664, subdivision (a), prescribing a punishment of life imprisonment with the possibility of parole for an attempt to commit murder that is 'willful, deliberate, and premeditated' . . . sets forth a penalty provision prescribing . . . a greater base term . . . to be imposed upon a defendant's conviction of attempted murder when the additional specified circumstances are found true by the trier of fact" (*People v. Bright* (1996) 12 Cal.4th 652, 669, fn. omitted, overruled in part on other grounds by *People v. Seel* (2004) 34 Cal.4th 535, 550, fn. 6; accord, *Serrano*, *supra*, 100 Cal.App.5th at p. 1339), not an enhancement (*Serrano*, at p. 1340). "As such, section 1385[,

9.

subdivision ](c) did not afford the trial court discretion to dismiss the jury's premeditation and deliberation findings based on the evidence of defendant's mitigating circumstances. Had the Legislature wanted section 1385[, subdivision ](c) to apply to premeditation findings as well as to enhancements as legally defined, it would have said so." (*Ibid*.)[6, 7]

At oral argument, defendant's appellate counsel focused on the premeditation finding and argued section 1385, subdivision (c)(2)(A)'s discriminatory sentencing circumstance and the Racial Justice Act. In spite of the fact that section 1385, subdivision (c) does not apply to the premeditation finding, counsel asked us to (1) construe the request to dismiss the allegation as a substantive Racial Justice Act claim based on racial disparity and bias in charging and sentencing and dismiss it; or (2) remand the case to the trial court to hold an evidentiary hearing; or (3) stay the appeal and remand the case to the trial court to allow defendant to make the Racial Justice Act motion and request additional discovery to support his claim. We will not ignore the fact that section 1385, subdivision (c), does not apply to the premeditation finding. We decline counsel's requests.

## II. The trial court did not abuse its discretion when it denied defendant's request for mental health diversion.

### a. *Background*

On January 18, 2023, defendant filed a "MOTION FOR DETERMINATION OF ELIGIBILITY FOR DIVERSION PURSUANT TO . . . SECTION 1001.36." (Boldface omitted.) He contended diversion should be granted because he "suffers from mental disorders identified in the most recent edition of the Diagnostic and Statistical Manu[a]l

---

[6] Defendant suggests we examine the legislative history. "Because the statutory language is clear and unambiguous, we follow its plain meaning and do not consider the legislative history cited by defendant." (*Burke*, *supra*, 89 Cal.App.5th at p. 243, fn. omitted.)

[7] In view of our disposition, we need not consider the Attorney General's other arguments.

of Mental Disorders," "[the] mental disorder played a significant role in the commission of the charged offenses," and he "currently does not pose an unreasonable risk of danger to public safety and could be treated in the community." Attached to defendant's motion was a "Psychological Evaluation" signed by Dr. L. Sidhu and dated December 27, 2022.

According to the aforementioned evaluation, Sidhu—a clinical and forensic psychologist—interviewed defendant on November 9, 2022. Defendant related he "did not have a happy childhood." He was "physically abused by his parents," "bullied by his older siblings," and "forced to bully other children by his brothers." Defendant was chronically depressed and anxious and often harbored "suicidal thoughts." He "engaged in fights" and "shot at birds with a BB gun." Defendant was sent to juvenile hall numerous times and was "sexually abused" there. During one stint in 1993, he "began hearing voices" " 'constantly' " that "simply told him to protect himself and 'stay inside.' " In addition, defendant saw "a black shadow that followed him" and sometimes felt " 'someone touching [him] in the back.' " He told Sidhu "[the] voices have 'never gone away' since they began."

Defendant began smoking cigarettes when he was eight years old and then graduated to marijuana and methamphetamine use. He "used drugs on a daily basis since adolescence." Defendant had been sober "for approximately ten years before relapsing about two years prior to" the June 25, 2014 shooting.

Sidhu administered the M-FAST,[8] "a brief structured interview used to assess for the feigning of psychopathology." The results of the M-FAST demonstrated defendant "endorsed items reflective of feigning psychopathology," namely "exaggerated symptoms," "unusual symptoms," and a "rare combination of symptoms." Sidhu also reviewed relevant documentation, including a probation officer's report dated May 8, 2015. The report confirmed defendant had been convicted of possession of a controlled

---

[8] This acronym stands for "Miller Forensic Assessment of Systems Test."

substance (Health & Saf. Code, § 11357, former subd. (b)) on October 8, 1999; misdemeanor receipt of stolen property (§ 496, former subd. (a)) on April 26, 2000; falsely representing oneself as another person to a peace officer (§ 148.9, subd. (a)) on August 17, 2000; being under the influence of a controlled substance (Health & Saf. Code, § 11550, former subd. (a)) on September 21, 2000; kidnapping (§ 207, subd (a)) with a finding he personally inflicted great bodily injury under circumstances involving domestic violence (§ 12022.7, subd. (e)) on April 3, 2002; and willful infliction of corporal injury upon a spouse (§ 273.5, subd. (a)) on February 7, 2013.

"Based on the defendant's presentation during th[e] interview and his psychosocial history," Sidhu diagnosed "unspecified schizophrenia spectrum and other psychotic disorder" (boldface omitted) as well as "antisocial personality disorder" (boldface omitted).  In light of defendant's "lengthy history of substance abuse," he reported "visual and tactile hallucinations comport with expectations of a substance induced psychotic disorder."  Sidhu pointed out "a more precise diagnosis cannot be rendered" given defendant's "signs of exaggeration."  As to whether defendant's disorders "played a significant role in the commission of the charged offense" on June 25, 2014, Sidhu opined:

> "According to available records and [defendant]'s account, he appears to have been psychotic at the time of the incident.  Apparently, he held the paranoid belief that there was a conspiracy against him and, perhaps, [the victim] was involved.  [Defendant's] account, however, is confused and contradictory.  His account also conflicts with information in available records with regard to the circumstances.  In addition, it is recalled that on the M-FAST, there are indications that he exaggerated his symptom presentation.  Finally, [defendant] was using methamphetamine for a year leading up to the incident and just prior to the incident.  This further confounds the nature of his disorder at the time of the incident.
>
> "Taking these factors into consideration, it appears that psychotic symptoms were genuine, but the etiology of his symptoms at the time are unclear.  The most parsimonious explanation is that his symptoms were likely substance-induced.  Therefore, his diagnosis of unspecified

12.

schizophrenia spectrum and other psychotic disorder likely played a significant role in the commission of the crime. [Defendant] has also been diagnosed with antisocial personality disorder, though this likely had a contributory effect on his offense given his general criminality."

Regarding whether defendant "poses an 'unreasonable risk of danger to public safety' if treated in the community," Sidhu opined:

"No one has the ability to divine an individual's future actions and risk assessment is inherently probabilistic in nature. With this said, [defendant's] risk is of concern. First, it is noted that his current offense is an attempted homicide, which means he has the capacity to engage in an enumerated offense [under section 667, subdivision (e)(2)(C)]. Yet, research also shows that homicidal acts have a low base rate of occurrence and individuals who engage in such behaviors have low recidivism rates. Of course, most find themselves incarcerated for lengthy periods of time. The primary contributing factor to [defendant]'s risk is his antisocial personality disorder. This is an individual with a broad pattern of general criminality which includes acts of violence since childhood. This risk is then exacerbated by his psychotic symptoms. Currently, [defendant] is stable; however, he has been in a locked and controlled setting since his offense. If one accepts the psychological adage that past behavior is the best predictor of future behavior, th[e]n [defendant's] past history of violence would speak to violence in the future. This is reflected in elevations in his HCR-20 historical items.[9]

"Overall, given the nature of his violence history, his antisocial personality, and the instability engendered by his psychosis and drug use, it is the opinion of this evaluator that [defendant] **would pose an unreasonable risk of danger**.

"With this said, it is conceivable that such risk could be mitigated sufficiently to allow for mental health diversion. This would require an intensive residential treatment program with consistent monitoring. Ideally, such a program would initially be in a locked facility and then allow for a transition to an unlocked residential facility. Treatment would need to

---

[9] HCR-20 is "a structured professional judg[]ment approach to risk assessment" "consist[ing] of 20 empirically supported risk factors organized into historical, clinical, and risk management scales." The elevated historical items mentioned by Sidhu include "*History of Problems with Violence*," "*History of Problems with Substance Abuse*," "*History of Problems with Major Mental Disorder*," and "*History of Problems with Violent Attitudes*."

13.

focus on addressing his psychosis, maintaining abstinence from drug and alcohol abuse, [and] managing his antisocial traits."

At the February 22, 2023 motion hearing, the trial court pronounced:

"So as I go through the factors, there are a number of factors. He is eligible but for one part, which is the last one. '. . . [T]he defendant will not pose an unreasonable risk of public safety if treated in the community,' and we go through . . . Section 1170.1[8], which then lists numerous crimes that it falls under.

"And I go back then and I take a look at the criminal history of the defendant and then particularly the report of Dr. Sidhu. And let me first state I am sensitive to mental health issues and the fact that this defendant does have mental health issues. There's no doubt in my mind. There's no doubt in my mind that this played a part in the decision-making of the defendant and probably in regard to the criminal history.

"It's not been an easy life for him. There's been many things that have happened, many of which I don't know, but I'm suspecting based on the information provided, and really this Court is in an unenviable position of recognizing all of this but then looking at the last factor and having to make a decision as to the last factor as is there an unreasonable risk of danger – risk of danger, and there is.

"There is an unreasonable risk of danger. How this all got to this point, that, in my view, makes you an unreasonable risk of danger, where it got to the point before this trial and decisions were made, maybe some of that is not your fault and not your responsibility. But the fact is I have a significant concern about that, and because of that, I don't believe you should be given the mental health diversion.

"I don't say this without thinking about this carefully. In fact, I've been thinking about this since we were first here and we were having continuances that were completely warranted in order to provide the Court with appropriate information. Fortunately or unfortunately, depending on each of your views, the report of Dr. Sidhu is quite clear.

"In fact, he puts it in bold on page 9. His viewpoint . . . . [¶] . . . [¶] . . . is quite clear on page 9 of his report that [defendant] would pose an unreasonable risk of danger.

"Now, there's a lot of other information in there that kind of mitigates those findings, but I'm making my own mind up, and when I look

14.

at the antisocial behavior and I look at what specifically happened in this case and what's happened in the past before that, that is a big concern.

"So I'm not going to refer [defendant] to mental health diversion . . . for those reasons. Do I think that mental health treatment would be of assistance to [him]? Yes.

"Do I think diversion is the right path? No, and that's why what I just stated, but I don't think there's anything further to articulate on that."

On September 6, 2023, defendant filed "SENTENCING LETTERS & MENTAL HEALTH RECORDS," which included proof defendant completed a domestic violence course, letters from a defense investigator detailing interviews with defendant's friends and acquaintances concerning defendant's character, and defendant's mental health records for the period September 20, 2022, to June 28, 2023. At the September 21, 2023, hearing, defense counsel renewed the section 1001.36 motion. The court pronounced:

"In regard to the renewal of the motion for mental health diversion, there are extensive documents in support of [defendant], including the records while he's been in custody and everything else that's been provided. The ruling remains the same, and it remains the same in light of the danger [defendant] poses.

"The new information is good information. I did think about it carefully and considered all the options that are appropriate, but I'm not going to grant mental health diversion."

b. *Legal overview*

"In 2018, the Legislature enacted section 1001.36 to create a program of pretrial diversion for criminal defendants with diagnosed mental health disorders. [Citation.] Diversion allows for the suspension of criminal proceedings and potential dismissal of charges upon successful completion of mental health treatment. [Citation.] The express purpose of this legislation was to '[i]ncrease[] diversion of [such] individuals' [citation] based on concerns that 'incarceration only serves to aggravate [their] preexisting conditions and does little to deter future lawlessness.' [Citation.] Successful mental

15.

health treatment, in contrast, both helps the individual and makes the community safer." (*Sarmiento v. Superior Court* (2024) 98 Cal.App.5th 882, 890–891 (*Sarmiento*).)

"Effective January 1, 2023, mental health diversion requires trial court findings that the defendant is both *eligible* for diversion and *suitable* for the program." (*Sarmiento*, *supra*, 98 Cal.App.5th at p. 891.) "Defendants are eligible if they have been diagnosed with a recognized mental disorder that was a significant factor in the commission of the criminal offense with which they are charged." (*Ibid.*, citing § 1001.36, subd. (b).) There is "a [statutory] presumption that the defendant's diagnosed mental disorder was a significant factor in the commission of the charged crime" (*Sarmiento*, *supra*, at p. 891) and a court "is directed to find a causal connection 'unless there is clear and convincing evidence that [the mental disorder] was not a motivating factor, causal factor, or contributing factor to the defendant's involvement in the alleged offense' " (*ibid.*, quoting § 1001.36, subd. (b)(2)).

On the other hand, one is suitable for diversion if "(1) in the opinion of a qualified mental health expert, the defendant's mental disorder would respond to treatment; (2) the defendant agrees to waive their speedy trial rights; (3) the defendant agrees to comply with treatment requirements; and (4) the defendant will not pose an 'unreasonable risk of danger to public safety' as defined in sections 1170.18 and 667, subdivision (e)(2)(C)(iv)." (*Sarmiento*, *supra*, 98 Cal.App.5th at p. 891, citing § 1001.36, subd. (c).)

An " 'unreasonable risk of danger to public safety' means an unreasonable risk that the petitioner will commit a new violent felony within the meaning of clause (iv) of subparagraph (C) of paragraph (2) of subdivision (e) of Section 667." (§ 1170.18, subd. (c).) "The violent felonies encompassed in [section 667, subdivision (e)(2)(C)(iv)] 'are known as "super strikes" and include murder, attempted murder, solicitation to commit murder, assault with a machine gun on a police officer, possession of a weapon of mass destruction, and any serious or violent felony punishable by death or life imprisonment.' [Citation.]" (*People v. Moine* (2021) 62 Cal.App.5th 440, 449.) Thus, to deny diversion

on the grounds the defendant poses an unreasonable risk of danger to public safety, "a trial court necessarily must find the defendant is 'likely to commit a super-strike offense.' [Citation.]" (*Id.* at p. 450.) "The court may consider the opinions of the district attorney, the defense, or a qualified mental health expert, and may consider the defendant's treatment plan, the defendant's violence and criminal history, the current charged offense, and any other factors that the court deems appropriate." (§ 1001.36, subd. (c)(4).)

"Assuming the defendant is both eligible and suitable, the trial court must also be satisfied 'that the recommended inpatient or outpatient program of mental health treatment will meet the specialized mental health treatment needs of the defendant.' " (*Sarmiento, supra*, 98 Cal.App.5th at p. 892, quoting § 1001.36, subd. (f)(1)(A)(i).) "Finally, even where defendants make a prima facie showing that they meet all the express statutory requirements, the court may still exercise its discretion to deny diversion. [Citations.] But this 'residual' discretion must be exercised ' "consistent with the principles and purpose of the governing law." ' [Citations.] That purpose includes a strong legislative preference for treatment of mental health disorders because of the benefits of such treatment to both the offending individual and the community. Where the court chooses to exercise this residual discretion to deny diversion, its statement of reasons should reflect consideration of the underlying purposes of the statute and explain why diversion would not meet those goals. [Citation.]" (*Sarmiento, supra*, at pp. 892–893.)

c. *Standard of review*

An appellate court will "review for abuse of discretion the trial court's decision whether to grant a request for mental health diversion." (*People v. Gerson* (2022) 80 Cal.App.5th 1067, 1080.) "A decision that 'exceed[s] the bounds of reason' [citation] or 'is so irrational or arbitrary that no reasonable person could agree with it' [citation] constitutes an abuse of discretion." (*Sarmiento, supra*, 98 Cal.App.5th at p. 902; see *In re Marriage of Burgess* (1996) 13 Cal.4th 25, 32 [reviewing court required to uphold a

discretionary ruling "if it is correct on any basis, regardless of whether such basis was actually invoked"].)

    d. *Analysis*

The trial court concluded defendant was unsuitable for diversion because he would pose an unreasonable risk of danger to public safety. In reaching this determination, the court considered defendant's criminal history as well as Sidhu's psychological evaluation.

Between 1999 and 2014, defendant was convicted of numerous offenses, a chronological examination of which already evinces a pattern of escalating gravity and violence. (Cf. *Sarmiento*, *supra*, 98 Cal.App.5th at p. 897 ["lack of a prior record of violence"]; *People v. Williams* (2021) 63 Cal.App.5th 990, 1003 (*Williams*) ["*no* prior criminal record"].) Then, on June 25, 2014, with an unequivocal intent to kill, he fired multiple gunshots at the victim's residence. Defendant was convicted of attempted murder—one of the super strikes listed under section 667, subdivision (e)(2)(C)(iv)—and the jury found this crime was willful, deliberate, and premeditated. (Cf. *Sarmiento*, *supra*, at p. 897 ["[T]he charged offense in this case[, i.e., attempted robbery,] involved no evidence of a weapon or threat of violence."]; *Williams*, *supra*, at p. 1002 ["The pending charges[, i.e., felony stalking and misdemeanor criminal threats,] were not super-strike offenses . . . ."]; see *Williams*, at p. 1003 [the defendant "never actually assaulted anyone or engaged in any violence"].) "From this, the trial court could reasonably infer that there was a significant risk that [the defendant] could commit an even more serious, violent felony in the future . . . ." (*People v. Brown* (2024) 101 Cal.App.5th 113, 124.)

Sidhu himself opined defendant "would pose an unreasonable risk of danger" (boldface omitted) "given the nature of his violence history, his antisocial personality, and the instability engendered by his psychosis and drug use." (Cf. *Williams*, *supra*, 63 Cal.App.5th at p. 1003 ["uncontroverted opinion of two mental health professionals" the defendant "poses a low risk to public safety"].) Though the psychologist intimated risk mitigation was "conceivable," a reasonable court could disagree. (See *People v. Graham*

(2024) 102 Cal.App.5th 787, 799 [" '[T]here is nothing in section 1001.36, with respect to . . . suitability, that precludes a trial court from relying primarily, or even entirely, on the circumstances of the charged offense or offenses in denying a motion for diversion.' "]; see also *People v. Brown*, *supra*, 101 Cal.App.5th at pp. 123–124 ["[U]nder the applicable standard of review, we may not substitute our own judgment for that of the trial court, and instead must defer to the trial court's weighing of the evidence."].)

We find the court's denial of defendant's section 1001.36 motion neither irrational nor arbitrary.

## DISPOSITION

The judgment is affirmed.


DETJEN, J.

WE CONCUR:


LEVY, Acting P. J.


FRANSON, J.